COMMONWEALTH *vs*. RONALD E. ALLARD, JR.

Hampden. April 6, 1999. - June 21, 1999.

Present: WILKINS, C.J., LYNCH, FRIED, MARSHALL, & IRELAND, JJ.

*Practice, Criminal,* Instructions to jury, Reasonable doubt, Jury and jurors, Presumptions and burden of proof, Capital case.

At a murder trial, the judge's instruction to the jury on reasonable doubt was correct and his use of the phrase "abiding conviction" was proper; no substantial likelihood of a miscarriage of justice was created. [759-761]

At a murder trial, no prejudicial error resulted from the judge's instructions to the jury on their function, in light of the instructions emphasizing the jurors' "great responsibility" and the prosecution's heavy burden of proof. [761-762]

At a murder trial, the judge's instructions to the jury sufficiently conveyed that the Commonwealth had the burden of proving the elements of the crime beyond a reasonable doubt and did not create a substantial likelihood of a miscarriage of justice. [762]

INDICTMENT found and returned in the Superior Court Department on September 9, 1994.

The case was tried before *John F. Moriarty*, J.

*Kevin J. Mahoney* for the defendant.

*Jane Davidson Montori*, Assistant District Attorney, for the Commonwealth.

LYNCH, J. On April 5, 1995, a jury convicted the defendant of murder in the first degree based on deliberate premeditation and extreme atrocity or cruelty. The defendant now appeals, challenging the judge's jury instructions. Because he did not object to the judge's instructions below, we review them to determine whether there was a substantial likelihood of a miscarriage of justice. See G. L. c. 278, § 33E.[1] We affirm the conviction and decline to exercise our statutory power to reduce or to vacate the defendant's conviction under G. L. c. 278, § 33E.

We summarize the evidence in the light most favorable to the

---

[1]The parties dispute whether the defendant objected to one aspect of the charge. We, therefore, consider the merits of that particular claim.

Commonwealth. The defendant and the victim's former girl friend, Kerrie Smallwood, were engaged to be married on August 20, 1994. A week before the wedding was to occur, however, she terminated their engagement and resumed her relationship with the victim. After this abrupt breakup, the defendant threatened to kill the victim. At the defendant's request his friend, Daniel Hiersche, telephoned the victim pretending to be a manager with the Milton Bradley Company, and scheduled a nonexistent job interview for the following Saturday morning, August 20.[2] Smallwood and another witness corroborated the victim's receiving this telephone call.

On August 19, the victim drove Smallwood, her son, and two other women to Smallwood's apartment. The defendant, who lived in the neighborhood, approached the automobile, greeted the victim, and offered to show him the route to Milton Bradley. The victim accepted the offer and they followed the defendant to the building, where the defendant suggested that he park in the rear.

Later that evening, two other women accompanied Hiersche and another man to the defendant's apartment. Hiersche and the defendant showed the women a twelve-inch metal "dumbbell" bar and "brass knuckles." They passed the bar around and discussed a plan to confront the victim when he showed up for the nonexistent interview the following morning.

On August 20, the victim left for the interview. His friends never saw him again. Although the defendant had plans to go grocery shopping with Smallwood that day, he did not arrive home until sometime between 5 P.M. and 6 P.M. He told her that he had gone hiking with two friends, and that he had to drive them home. Several hours later when the defendant returned and drove Smallwood to her friend Tammy's house, Tammy asked where he had been. The defendant replied that he had gone rock climbing. Tammy expressed surprise that he had gone rock climbing in jeans, sneakers, and a T-shirt without getting dirty or sunburned despite his previously demonstrated sensitivity to the sun.

The next day, the defendant told Hiersche he had killed the

[2]Kerrie Smallwood and another witness testified that they had overheard the defendant's telling the victim that he had a job interview coming up at Milton Bradley, but because he already had a job, he had given the interviewers the victim's telephone number. The defendant had also told Smallwood that he had given the victim's telephone number to someone at Milton Bradley.

victim, after meeting him at Milton Bradley. The defendant said he distracted the victim and then hit him three times in the head with the metal bar. He then put the victim into the automobile and drove around for several hours, waiting for him to lose consciousness. Eventually he went to a wooded area known as Wolf Swamp. When he got out of the automobile, the victim tried to protect himself by locking the doors, whereupon the defendant smashed the window, dragged him into the woods, and beat him until he stopped moving.

On August 21, the defendant brought Hiersche to the woods and showed him the body. He dragged the body further into the woods and covered it with a section of discarded fence and a blanket. The two then moved the victim's automobile to an "urban area" thirty to forty-five minutes away from the crime scene.

As time progressed and the victim had not turned up, his friends became increasingly concerned. The defendant made suspicious statements to friends, including asking Tammy to help him influence Smallwood to be his girl friend again if the victim did not return "in say two weeks." The defendant later speculated, "I wonder if they find [the victim's automobile] like in someplace in Connecticut or something if it would be brought back here to Massachusetts and the police here would handle it?"[3] When Tammy asked what he was talking about, he responded, "Well, what if they find [the victim] before and he was a minor or something, before he was an adult, would it be a minor's case or an adult's case?" The defendant also admitted to the victim's father that he had stalked the victim while dressed in black and wearing a mask.

The defendant told friends that he had seen the victim with "some girl" in a blue Pontiac Sunbird automobile with Vermont registration plates, and that he had chased the automobile for over one hour before his automobile overheated, forcing him to give up the pursuit. The defendant visited the victim's father and claimed that, after the chase, the blue Pontiac Sunbird automobile had followed him for hours and its driver had attacked him at a telephone booth as he tried to call for help by holding a knife to his throat and telling him that "people had better stop looking for [the victim] or I'm going to come back and kill you."

---

[3]Two days after the defendant made this remark, police recovered the automobile in Enfield, Connecticut.

Four days after the victim's disappearance, the defendant brought Hiersche and another friend to the victim's automobile. They moved it again and abandoned it. The police discovered the automobile the following day, with the smashed window and heavy bloodstains in the interior. On August 31, officers spoke with Hiersche, who led them to the body. Hiersche had initially lied to police about his involvement in the killing, but eventually entered into a cooperation agreement with the police and, according to the defendant, pleaded guilty to being an accessory before the fact to murder in the first degree. At trial, the medical examiner testified that there were a number of fractures on the victim's skull consistent with the multiple blows to the head, as well as considerable loss of blood. The defendant claimed that Hiersche murdered the victim.

The defendant argues that the judge (1) defined reasonable doubt in a manner that confused the jury as to the Commonwealth's burden of proof; (2) should not have instructed the jury that their function was to search for the truth; and (3) improperly shifted the burden of proof by suggesting that the jury had to convict unless they found a reasonable doubt. Because the defendant did not raise arguments one and three at trial, we review those claims to determine whether the jury instructions created a substantial likelihood of a miscarriage of justice and conclude that there was no such likelihood. *Commonwealth* v. *Pucillo*, 427 Mass. 108, 115 (1998), citing *Commonwealth* v. *Wright*, 411 Mass. 678, 681 (1992). We conclude that error alleged in claim two was, in any event, not prejudicial. The defendant also urges us to exercise our power under G. L. c. 278, § 33E, to reduce or to set aside the verdict. We decline to do so and affirm the conviction.

1. *Propriety of reasonable doubt instruction.* The defendant first argues that the judge's charge on reasonable doubt was improper. The judge's charge, set out in the margin,[4] is almost identical to the instruction given by the same judge in another

---

[4]In instructing the jury on reasonable doubt, the judge stated:

"Now, the presumption of innocence means that all right but it also means a great deal more than that. The presumption of innocence also means that no one charged with having committed a crime must prove his or her innocence. Quite the contrary is true, the Commonwealth, the government must prove his or her guilt, and must prove it beyond any reasonable doubt. And it's the absolute right of everyone of us, that includes all of you, it includes me, and it includes [the defendant] if charged with a crime, to simply come to court, plead not guilty, and then say to the Commonwealth, to the government; now

case of murder in the first degree that we have upheld on appeal, *Commonwealth* v. *Watkins*, 425 Mass. 830, 836-839 & n.9 (1997). In that case, we reasoned:

"[T]he judge contrasted the heavy burden of proof resting on the Commonwealth in a criminal case with the 'fair preponderance of the evidence' standard applicable in civil cases, emphasizing that the Commonwealth's burden is 'much greater than' the civil standard, and that '[t]o simply prove in a criminal case that the defendant is more probably guilty than not is not nearly enough.' That contrast provided the jury with the context to understand the

you prove it, and say absolutely nothing else if we wish. And the burden then rests on the Commonwealth to prove each essential element of the crime that has been charged and to prove it beyond any reasonable doubt.

"Now I have stressed that expression; beyond any reasonable doubt. I have done that very deliberately because this is the second but equally important part of this concept and that, too, requires some explanation. What precisely does that mean?

"Well just by way of contrast if last week when you came here to court to serve as jurors you had been selected to sit on the trial of a civil case rather than a criminal case, you probably would have learned in the course of such a trial that in a civil case one side or the other has the burden of proving facts by what is called a preponderance of the evidence, a clear preponderance of evidence, which really means simply to prove that a given fact is more likely, more probable than not.

"Now that's the standard in a civil case. But in a criminal case, and this is a criminal case, the burden that rests on the government is much greater than that. To simply prove in a criminal case that the defendant is more probably guilty than not is not nearly enough. In a criminal case the facts must be proved beyond reasonable doubt and that means to a moral certainty or an abiding conviction. Anything less than that degree of conviction as to any fact or fact necessary to a conviction upon the particular charge would mean that the Commonwealth had not proved its case and the defendant would be entitled to an acquittal.

"Now a word of caution, however, proof beyond a reasonable doubt does not mean proof beyond all doubt or an imaginary doubt. A reasonable doubt for example is not the doubt that might exist in the mind of a man or a woman searching for some doubt as an excuse to acquit a defendant, it does not mean that and it does not mean absolute proof or proof to mathematical certainty if indeed there is such a thing as mathematical certainty. But what it does mean is such proof as fully convinces you as reasonable persons now earnestly seeking the truth, that the defendant is guilty. Such proof as instills in your minds a firm conviction of guilt. Anything less than that degree of conviction as to any fact . . . necessary to a conviction upon the particular charge would mean that the Commonwealth had not proved its case and the defendant would be entitled to an acquittal."

concept of reasonable doubt, and stressed the far higher standard required to convict a defendant in a criminal case. In addition, the judge emphasized to the jury that proof beyond a reasonable doubt means 'such proof as *fully convinces you* as reasonable persons . . . that the defendant is guilty' (emphasis added)."

(Footnote omitted.) *Id.* at 838. The judge's instruction in the instant case deviated from this language only by including the phrase "abiding conviction." Not only have we commented favorably on the use of this phrase, *Commonwealth* v. *Watkins, supra,* but the United States Supreme Court has done so as well. *Victor* v. *Nebraska,* 511 U.S. 1, 14-15 (1994). Accordingly, the charge was not erroneous in this regard.

2. *Instruction on the jury's function.* The defendant also challenges the judge's characterization of the jury's function as a search for the truth. The parties apparently dispute whether the defendant objected on these grounds at trial. We need not resolve this conflict, however, for we conclude that the instructions were not prejudicial and the argument thus fails under either standard of review.

The portion of the charge relevant to this discussion is as follows:

> "*Every trial, civil or criminal, is or ought to be a search for truth. Your object is to reach a verdict. The very word, verdict, comes from the Latin [phrase meaning] 'speak the truth.'* And it's with that object in mind that you should approach this fact finding function . . . . [I]t is the absolute right of this defendant . . . that he shall not be convicted unless his guilt has been established to your satisfaction beyond any reasonable doubt." (Emphasis added.)

Although this statement was not entirely correct because a jury's function in determining guilt or innocence involves more than resolving the credibility conflicts, no prejudicial error resulted. "The charge emphasized the 'great responsibility' of the jurors to ascertain the truth from the evidence presented, and generally impressed on the jurors the caution and care they must exercise before returning any verdict against any defendant." *Commonwealth* v. *Limone,* 410 Mass. 364, 370 (1991), quoting *Com-*

*monwealth* v. *Tameleo*, 384 Mass. 368, 371 (1981). Moreover, the judge explicitly emphasized the prosecution's heavy burden of proof immediately after telling the jury to seek the truth.

3. *Effect of the judge's instructions on burden of proof.* The defendant next challenges the judge's statement to the jury that "if [they] have determined [that] the defendant did in fact kill [the victim] without justification or excuse, but have found a reasonable doubt as to whether he did so with malice afore-thought, [they] must then consider whether he did it with . . . an act of reckless, wanton conduct." The defendant argues that this instruction told the jury to convict the defendant unless they found a reasonable doubt, rather than requiring proof of the crime beyond a reasonable doubt. The defendant correctly concedes that, in isolation, this sentence does not require reversal. Viewing this statement in context, the curative sentences clarified any potential ambiguity:

> "Here again on all of these facts the Commonwealth has the burden of proof, proving each element of the crime and proving it beyond any reasonable doubt. And if you had discounted the charge of murder and also had a reasonable doubt as to whether the conduct of the defendant was reckless or wanton, then you would be required to return a verdict of not guilty on behalf of the defendant."

As the instructions sufficiently conveyed to the jury that the Commonwealth had the burden of proving the elements of either theory beyond a reasonable doubt, this statement did not create a substantial likelihood of a miscarriage of justice.

4. *General Laws c. 278, § 33E, review.* We have reviewed the record pursuant to our power under G. L. c. 278, § 33E, and, in light of the strength of the Commonwealth's case, discern no substantial likelihood of a miscarriage of justice warranting the exercise of our power to reduce or to vacate the defendant's conviction.

*Judgment affirmed.*